IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CONSOLIDATED CONTAINER
COMPANY, LP

    Plaintiff,

v.   No. 05-2371 B

WARREN UNILUBE, INC.,

    Defendant.
_____

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
_____

Before the Court is the motion of the Plaintiff, Consolidated Container Company, LP ("CCC") for a preliminary injunction to enjoin the Defendant, Warren Unilube, Inc. ("Warren"), from terminating a bottle supply agreement. For the reasons set forth below, Plaintiff's motion is GRANTED.

BACKGROUND

CCC is a manufacturer of plastic bottles and containers which operates approximately 60 blow molding facilities in the United States. (Aff. Jeff. Greene ("Greene Aff.") ¶ 3; Transcript of Proceedings ("Tr.") at 22.) Defendant Warren is a manufacturer and distributor of motor oils and other chemicals, which maintains an oil blending and distribution facility in West Memphis, Arkansas. (Compl. ¶ 7.) The instant action arises from a dispute regarding a Bottle Supply Agreement ("BSA") entered into by the parties' predecessors in interest, Continental Plastic Containers, Inc. ("Continental") and Coastal Unilube, Inc. ("Coastal"), on February 10, 1994.[1]

---

[1] The BSA was subsequently amended on April 24, 1998, May 25, 2000, May 13, 2002 and October 25, 2002. (BSA at 37-53.)

(Bottle Supply Agreement ("BSA") at 1.)  In the BSA, Continental agreed to manufacture and maintain a mutually agreed upon inventory level of plastic bottles for Coastal at a "Near Site," defined as a "site across the street from Coastal," in West Memphis, Arkansas. (BSA at 1; § 1, 1.1.) Prior to entering into the BSA, Continental did not operate any manufacturing facilities in the West Memphis, Arkansas area.  (Aff. Mike Barrett ("Barrett Aff.") ¶ 4.)   In accordance with the BSA, it established a facility approximately one mile from Warren's plant.  (Aff. Brian Thrasher ("Thrasher Aff.") ¶ 4.)

As executed by Continental and Coastal, the BSA explicitly provided that

> [u]nless earlier terminated pursuant to other provisions of this Agreement, the Agreement shall be effective for an initial period of five (5) years beginning from first commercial production, which shall be no later than six (6) months from the signing of this Agreement and shall automatically be renewed for terms of twelve (12) months thereafter, subject to termination by either party following the end of the initial period by giving written notice of termination six (6) months in advance of the anniversary date.

(BSA at § 2, 2.1.)  Further, the parties agreed that

> [i]t is the intention and understanding of the parties that this Agreement is personal to CONTINENTAL and COASTAL.  CONTINENTAL and COASTAL agree that they shall not sell, transfer, assign, merge or otherwise dispose of CONTINENTAL's or COASTAL's interest in this Agreement, in whole or in part, directly or indirectly, by operation of law or otherwise, without prior written consent of COASTAL or CONTINENTAL. CONTINENTAL and COASTAL agree that they shall not delegate the performance of the terms and conditions of this Agreement to another without the prior written consent of COASTAL or CONTINENTAL.  Consent of parties required by this paragraph cannot be waived except in writing.  Any such purported sale, transfer, assignment, merger, disposition, or delegation of CONTINENTAL'S or COASTAL'S interest and/or performance of the terms and conditions of this Agreement, without such prior written consent, shall be null and void and not binding on COASTAL or CONTINENTAL.

(BSA at § 11, 11.1.)

During the years that followed the execution of the BSA, several changes occurred with

regard to the terms of the Agreement and the parties affiliated with it. On April 29, 1998, among other changes, Continental and Coastal agreed to extend the BSA contract to December 31, 2002.[2] (BSA at 37-39.) In May 1999, Continental merged with the Plaintiff. Following the merger, CCC assumed Continental's status, rights and obligations under the BSA and Coastal provided its consent to the assignment in writing. (Aff. H. Lawrence Sanderson, III ("Sanderson Aff.") ¶ 6; Def.'s Mem. Resp. Pl.'s Mot. Prelim. Injunct. ("Def.'s Resp.") at 2.) After approximately three years of performance of the BSA by Coastal and CCC, the parties agreed on May 13, 2002 that "[t]he term of the BSA shall be extended through December 31, 2007, unless terminated earlier or extended in accordance with the provisions of section 2 of the BSA." (BSA at 44-49.)

By letter dated December 12, 2003, Coastal informed CCC that it was transferring its rights under the BSA to Defendant Warren, who, according to the letter, "agreed to accept the assignment of the Agreement and to pay, discharge, and perform all of the obligations and liabilities of Coastal under the Agreement." (Aff. Louis Lettes ("Lettes Aff.") , Ex. B.) Consistent with Section 11.1 of the BSA, the December letter further requested CCC's consent to the assignment of Coastal's "right, title and interest in and under the Agreement" to Warren by execution of the letter "as soon as possible." (Lettes Aff. Ex. B.) CCC responded to the request for consent by letter dated January 23, 2004, detailing recent communications regarding the assignment and noting its concern regarding Warren's intent to honor the BSA. (Lettes Aff. Ex. C. at 1-2.) Regarding its consent to the assignment, CCC stated that it "will not consent to any assignment of Coastal's obligations under the Agreement until it receives adequate assurances that the new party will fully comply with the

---

[2] As executed by the parties, the amendment specifically provided that "[t]he BSA contract is extended to December 31, 2002." (BSA at 37-39.)

terms of the Agreement." (Lettes Aff. Ex. C. at 2.) Nearly one year after notice of the assignment to Warren, CCC provided the requested consent on December 3, 2004, stating that "[t]hrough Warren's and CCC's conduct since last December, both companies have demonstrated a willingness to continue working together under the terms of the agreement. CCC is therefore finally willing to sign the formal consent pursuant to your original request." (Lettes Aff. Ex. D.) It is uncontested that the parties continued to supply and purchase bottles consistent with the provisions of the BSA during the period between Warren's request and CCC's provision of consent.[3]

Approximately one month after notice of CCC's consent to the assignment, on January 19, 2005, the company notified Plaintiff that

> [p]ursuant to Section 2.1 of the Bottle Supply Agreement of February 10, 1994 approved for assignment to Warren Unilube, Inc. ("Warren") in your letter of December 3, 2004, written notice is hereby given of termination of that Bottle Supply Agreement between Warren and Consolidated Container Company, effective September 1, 2005. This notice provides a notice in excess of the six (6) months required by the Agreement.

(Lettes Aff. Ex. E.) CCC subsequently initiated this action on May 18, 2005 claiming that Warren has anticipatorily breached the BSA and that it is entitled to an injunction prohibiting any such termination prior to December 31, 2007.

## ANALYSIS

In ruling on a preliminary injunction under Federal Rule of Civil Procedure 65, a court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be

---

[3] Warren contends that it purchased bottles from CCC during this period on an "as-needed basis," not in performance of the BSA.

served by issuance of the injunction." Rock and Roll Hall of Fame and Museum v. Gentile Prods., 134 F.3d 749, 753 (6th Cir. 1998). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003). "While the Court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision." De Boer Structures (U.S.A.) Inc. v. Shaffer Tent and Awning Co., 187 F. Supp. 2d 910, 919 (S.D. Ohio 2001). "The Court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix." Id. (citing In re Eagle-Picher Indus., Inc., 963 F.2d 855, 859 (6th Cir. 1992).

I. CCC's Likelihood of Success on the Merits

In order to prevail on its claim in the instant action, CCC must demonstrate that Warren is in fact bound by the BSA and that it repudiated or anticipatorily breached the Agreement in stating its intention to terminate pursuant to Section 2.1.[4]

*A. Validity of the Assignment of the BSA from Coastal to Warren*

The Defendant first maintains that the purported assignment of the BSA from Coastal to Warren is invalid because CCC "refused to consent" as required by Section 11.1 of the Agreement to effectuate the assignment. (Def.'s Mot. at 7.) The Defendant further insists that the consent ultimately given by CCC in December 2004 was ineffective because it came nearly one year after consent was solicited. (Def.'s Mot. at 9-10.) As noted above, the BSA contains an express provision requiring the written consent of the non-assigning party to any assignment of interest in

---

[4] The Court notes that both parties have submitted arguments regarding the likelihood of CCC's success in defending Warren's promissory estoppel counterclaim. Because the issuance of a preliminary injunction is dependent only on the strength of the moving party's claim, Warren's claim need not be addressed here. See Rock and Roll Hall of Fame, 134 F.3d at 753 (noting that the showing required for the issuance of a preliminary injunction includes "whether the *movant* has a strong likelihood of success on the merits.") (emphasis added).

5

the Agreement. (BSA § 11, 11.1) Without consent of the non-assigning party, the BSA declares that any assignment "shall be null and void and not binding" on the parties. (BSA at §11.1.) Further, the Agreement notes that the consent requirement cannot be waived except in writing. (BSA at §11.1.) In its letter of December 12, 2003, Coastal and Warren requested that CCC provide its consent "as soon as possible," but with no specific time limitation. (Lettes Aff. Ex. B.)

When no time for performance of a contract is specified, Tennessee law provides that "a reasonable time is implied." Minor v. Minor, 863 S.W.2d 51, 54 (Tenn. Ct. App.1993). "What constitutes a reasonable time within which an act is to be performed ... depends on the subject matter of the contract, the situation of the parties, their intention in what they contemplated at the time the contract was made, and the circumstances attending the performance." Id. (quoting 17A Am.Jur.2d Contracts § 468). The determination of reasonable time for performance is generally a question of fact, however, it "never means indulgence in unnecessary delay."[5] Id.

Considering the circumstances surrounding the request for consent, the Court finds that CCC's response was provided within a reasonable time. Jeff Greene, the Senior Vice President of CCC's Consumer Packaging Group, testified that the company did not immediately consent to the assignment because CCC was uncertain who Coastal proposed to assign its interest to[6] and because

---

[5] The BSA does not require that either party provide its consent to an assignment. (BSA § 11, 11.1) Thus, the request for consent could reasonably be construed as an offer rather than as performance of an obligation under the contract. However, even if considered in this manner, the same analysis applies. See Allen v. National Advertising Co., 798 S.W.2d 766, 771 (Tenn. App.1990) ("Where no time is fixed in the offer it expires at the end of a reasonable time unless the parties treat the offer as continuing in force. What is a reasonable time depends largely on the nature of the particular offer and the circumstances of the case."); see also CJS CONTRACTS § 51 ("Where the offer does not specify a time for acceptance, an acceptance within a reasonable time will be effective.").

[6] Kent Farmer, the President and Chief Operating Officer of Coastal Unilube, a direct subsidiary of Coastal Corporation, at the time of the merger with Warren, explained the transaction in the following manner:

the company had received information from which it concluded that Warren did not intend to honor the Agreement. (Tr. at 91.) Specifically, Greene noted receipt of an industry publication in which the Defendant discussed its acquisition of Coastal and identified making its own bottles as an "opportunity for savings." (Tr. at 93.) Greene also cited a report from a contact sales call in which Warren indicated its position that there was no contract between the parties because the Coastal acquisition was "an asset buy and no contracts or liabilities came with it." (Tr. at 93.)

The meetings and discussions the parties engaged in immediately following notice of Coastal's intention to assign its interest to Warren did little to assuage CCC's concern. (Tr. at 72.) Brad Beyers, an account manager for CCC, and Kent Farmer, President of Warren, both testified that during one of those meetings, Mr. Irvin Warren, the Chief Executive Officer of Warren, presented an invoice from a competitor of CCC, Constar, reflecting a significantly lower price per bottle than that provided for in the BSA.[7] While indicating his desire to continue a relationship with CCC, Mr. Warren informed the company that if they were unable to offer a competitive price, he would be forced to find other sources. (Tr. at 62.) Farmer testified that, to his knowledge, Mr. Warren believed at the time of the meeting that the acquisition of Coastal was solely an asset purchase, and, as a result, he did not have to honor the BSA. (Tr. at 62.) In accordance with this belief, Mr. Warren stated his opinion in discussions with CCC that the BSA was "not worth the paper it's

---

Coastal was purchased by El Paso [Corp.]. El Paso made the decision to divest every asset that was noncore, core meaning a pipeline. We were a direct subsidiary, a proximal subsidiary, but it was not core to the pipeline business. So El Paso, per their agreement with Wall Street, they would divest any asset that was not core to the pipeline to reduce their large debt. My subsidiary was one of them that went up for sale, and Mr. Warren was one of the parties that El Paso negotiated with to buy Coastal Unilube.

(Tr. at 42-42.)

[7] Specifically, the Constar invoice reflected a bottle price of $88 per thousand whereas CCC's price under the BSA was approximately $105 per thousand. (Tr. at 72.)

written on and [is] not binding." (Tr. at 72.) Following these meetings, Beyer noted that CCC had "grave concern" that the BSA would not be honored by Warren. Because the BSA accounts for 98% of the business of the West Memphis plant, the company would likely close the plant in the event the contract is terminated. (Tr. at 102.)

Despite its concerns, CCC ultimately consented to the assignment on December 4, 2004. Greene testified that the condition that CCC placed on its consent in February 2002, namely that it receive adequate assurances that Warren would comply with the BSA, had been met. (Tr. at 121.) Specifically, Greene noted that, during the months following the assignment, Warren provided such assurances "[t]hrough paying the current price, by taking freight allowances [in accordance with the BSA], through accepting price changes consistent with the language of the contract, [and by] continuing to purchase the volume stated in the contract." (Tr. at 121.)

Considering the circumstances surrounding Coastal's request for consent, the situation of the parties and the Defendant's failure to provide assurances other than continued performance, the Court concludes that CCC's consent was provided within a reasonable time. At the time of consent, the BSA was still in effect, no party had expressly stated an intention to terminate, and the parties were performing in accordance with their rights and obligations. Further, the Court notes that, upon receipt of CCC's consent, Warren did not state any objections, but rather acknowledged the consent and, in reliance upon it, invoked the BSA as the basis for its intent to terminate. Because CCC did, in accordance with Section 11.1 of the BSA, provide its written consent to the assignment of Coastal's interest to Warren, the assignment is valid and Warren is bound by its terms.

### *B. Anticipatory Breach of the BSA*

Tennessee Code Annotated § 47-2-610 provides that "[w]hen either party repudiates the

contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may . . . resort to any remedy for breach." TENN. CODE. ANN. § 47-2-610.  "To serve as an anticipatory breach of contract, the words and conduct of the contracting party must amount to a total and unqualified refusal to perform the contract." Dunn v. Matrix Exhibits, Inc., No. M2003-02725-COA-R3-CV, 2005 WL 2604048, *3 (Tenn. Ct. App. Oct. 13,2005).

  Success on Plaintiff's claim hinges on the interpretation of Section 2.1 of the BSA and subsequent amendments regarding the duration of the Agreement.  CCC argues that the plain language of the BSA and the May 2002 amendment makes clear the parties' intention to extend the initial period of Agreement to December 31, 2007.  Thus, according to CCC, Warren's letter of January 19, 2005, which explicitly indicated its intent to terminate the BSA without cause effective September 1, 2005 is a repudiation for which CCC is entitled to damages.  In response, however, the Defendant maintains that there has been no amendment to the initial five-year period of the BSA. Because that period has expired, Warren contends that, pursuant to Section 2.1, it may rightfully terminate upon six months notice.

  Under Tennessee law, "the cardinal rule for interpreting contracts is to ascertain the intention of the parties and give effect to that intention." Clark v. Rhea, No. M2002-02717-COA-R3-CV, 2004 WL 63476, *2 (Tenn. Ct. App. Jan. 13, 2004).  The intent of the parties is presumed to be that expressed in the body of the contract. Kafozi v. Windward Cove, LLC, No. E2004-01791-COA-R3-CV, 2005 WL 2051292, *4 (Tenn. Ct. App. Aug. 26, 2005).  In construing contracts, courts must give the words expressing the parties' intentions their usual, natural, and ordinary meaning. Braden v. Strong, No. M2004-02369-COA-R3-CV, 2006 WL 369274, *11

(Tenn. Ct. App. Feb. 16, 2006) (citing Ballard v. North American Life & Casualty Co., 667 S.W.2d 79, 82 (Tenn. Ct. App.1983)). "If the language of a written instrument is unambiguous, the Court must interpret it as written, rather than according to the unexpressed intention of one of the parties." Sutton v. First Nat. Bank of Crossville, 620 S.W.2d 526 (Tenn. Ct. App.1981). A dispute among the parties regarding the interpretation of a contract does not in itself make the contract ambiguous. Campora v. Ford, 124 S.W.3d 624, 627-628 (Tenn. Ct. App. 2003) (internal citations omitted). Further, the Court may not create an ambiguity where none exists. Id.

As noted above, Section 2.1 provides that

> [u]nless earlier terminated pursuant to other provisions of this Agreement, the Agreement shall be effective for an initial period of five (5) years beginning from first commercial production, which shall be no later than six (6) months from the signing of this Agreement and shall automatically be renewed for terms of twelve (12) months thereafter, subject to termination by either party following the end of the initial period by giving written notice of termination six (6) months in advance of the anniversary date.

(BSA at § 2, 2.1.). According to the plain language of the cited provision, the BSA, as originally executed, was to remain in effect for a period of five years from the first date of commercial production, which was to occur within the six-month period following February 10, 1994. During this initial five-year period, the parties could only terminate "pursuant to other provisions" of the contract, including those relating to force majeure (Section 8) or default (Section 10). Upon the expiration of the initial period, Section 2.1 provides that the BSA would be automatically renewed for annual terms subject to termination by either party effectuated by written notice six-months in advance of the anniversary date of the end of the initial period.

In April 1998, during the initial 5 year period, the parties agreed that the "BSA contract is extended to December 31, 2002." (BSA at 37-39.) In the absence of any other language indicating

a contrary finding, the common sense interpretation of this provision evidences the parties' intent to extend the initial period of the contract to December 31, 2002. Prior to the expiration of this period, on May 13, 2002, the parties subsequently agreed that "[t]he term of the BSA shall be extended through December 31, 2007, unless terminated earlier or extended in accordance with the provisions of section 2 of the BSA." (BSA at 44-49.) This statement unambiguously indicates an intent on the part of the parties to extend the initial period, or term, to December 31, 2007. However, consistent with Section 2, the amendment preserves the right of the parties to terminate pursuant to force majeure or default and leaves open the possibility of a future agreement to extend the period in which the parties may only terminate for cause. Thus, the plain language of the BSA and subsequent amendments demonstrates an intent that the "initial period" of the BSA, during which the termination rights of the parties are limited, be extended until December 31, 2007. Following this date, and absent an earlier termination for cause or an extension of the period, the contract will automatically renew each year unless or until either party provides written notice of its intent to terminate at least six months in advance of the anniversary date, or before June 30 of each year. According to this interpretation, termination may only rightfully be effectuated in the automatic renewal period on December 31.

Defendant Warren disputes this interpretation and maintains that the initial term, as stated in the BSA as executed in 1994, was intended by the parties to last 5 years. (Def.'s Resp. at 12-13.) Because more than 11 years have elapsed since its execution, Warren maintains that the parties must be in the annual renewal period. (Def.'s Resp. at 13.) The Court finds that this interpretation is without merit as it completely ignores the language of the 1998 and 2002 amendments as to the duration of the BSA as well as Section 2.1's requirement that notice be provided six-months in

11

advance of the "anniversary date," or the end of the initial period. In an effort to square its argument with the contract language, Warren argues that the amendments to the BSA could not have altered the initial period because the words "initial period" do not appear in the amendment provisions. (Def.'s Resp. at 13.) Rather, the 2002 amendment, of central importance in this action, uses the word "term." Warren maintains that, because Section 2.1 uses the word "term" and the amendment does not use the words "initial period," the plain language indicates that the parties did not intend to alter the initial period as defined in Section 2.1.

Assuming Warren's position, i.e. that the amendment extends the "term" rather than the "initial period" of the BSA, the result is that the BSA was effective for an initial five-year period from the date of commercial production. Following this period, the contract was, under Warren's interpretation, automatically renewed for terms, extended to December 31, 2007, of twelve months thereafter. Because such an interpretation results in an ambiguous and seemingly unintelligible provision, the Court rejects its application in favor of the plain meaning of the words of the parties as written and finds that the 2002 amendment expressed an intent on the part of the parties to extend the initial period of the BSA. See Campora v. Ford, 124 S.W.3d at 627-628 (noting that the Court may not create an ambiguity where none exists).

Because the plain and unambiguous language of the BSA and May 2002 amendment indicates the intent of the parties to extend the initial term of the agreement to December 31, 2007, Warren's unqualified statement of intent to terminate in advance of this date constitutes a repudiation for which CCC may recover under Tenn. Code. Ann. § 47-2-610.

II. Irreparable harm to CCC if an injunction is not issued

CCC argues that if Warren is permitted to terminate the BSA it will suffer irreparable harm.

Irreparable harm is a harm which is not fully compensable by money damages. Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992). "[A]n injury is not fully compensable by money damages if the nature of the [claimant's] loss would make damages difficult to calculate." Id. (citing Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984)).

CCC's West Memphis plant manufactures approximately two-thirds of the liter bottles and all of the gallon bottles required under the BSA. (Tr. at 8.) On a monthly basis, this amounts to production of approximately seven to eight million liter bottles and 800,000 gallon bottles for Warren. (Tr. at 8.) The remaining one-third of the BSA's liter bottle requirements are manufactured at CCC's Memphis plant. (Tr. at 8-9.) In total, the BSA accounts for 98% of the business of CCC's West Memphis plant. (Tr. at 8.) Because of its dependence on the BSA, CCC maintains that the termination of Warren's contract, namely the withdraw of its liter bottle orders, will result in "immediate and severe" injury. (Pl.'s Mot. at 22.) In addition to losing a significant revenue stream, CCC maintains that the loss of business will ultimately result in the closing of the West Memphis plant[8] and the termination of the majority of its thirty-three hourly employees and five managers currently employed there.[9] (Tr. at 7; 100-101.)

As noted above, CCC was required pursuant to the BSA to open its facility in West Memphis and submits that it has no other existing customers in the vicinity. (BSA at 1; Def.'s Mot. at 22.) Because the equipment used in the plant is specifically designed to manufacture high volumes of

---

[8] There is some indication in the record that Warren, despite its intent to terminate the BSA, seeks to continue to purchase gallon bottles from CCC. However, Green testified that the gallon business, because of its low volume, could not "cover the fixed costs of the facility," and thus would not sustain the plant. (Tr. at 100-101.)

[9] Greene testified that the company may be able to relocate less than ten of the employees to the Memphis facility. (Tr. at 102.)

uniformly shaped bottles, the Plaintiff maintains that it is unlikely that a replacement buyer could be located. (Barrett Aff. ¶ 6.) Further, it submits that the customization of its business to meet Warren's needs for local, high volume production have directly resulted in the exclusion of other potential customers. (Def.'s Mot. at 24.) If a customer were located, CCC has submitted evidence that the cost to convert the manufacturing lines, which were designed to meet Warren's needs, would be in excess of $500,000. (Def.'s Mot. at 5.) The Court also notes that CCC submits that the extension of the BSA in May of 2002 was a benefit it bargained for in exchange for a promise to upgrade its facility and add new equipment to better serve Warren's needs. (Aff. Brad Byers ("Byer Aff.") ¶ 4.) Because of the large capital investment required, CCC maintains that it would not have undertaken such expense without a long-term commitment for continued performance. (Byer Aff. ¶ 4.)

Conversely, Warren submits that, because CCC's harm results from a loss of revenue, money damages can compensate it if the termination of the contract is determined to be wrongful. (Def.'s Mot. at 18.) According to Warren, because the BSA is a contract to buy and sell bottles at an agreed upon price, which includes volume and pricing data, CCC's losses from the termination of the contract are not difficult to ascertain. (Def.'s Mot. at 19.) Further, Warren maintains that it intends to continue to purchase gallon bottles from the Plaintiff, thus the West Memphis plant is ensured of some continued revenue.[10] (Def.'s Mot. at 19-20.)

In the instant case, CCC stands to lose not only the revenue from the loss of the liter bottle sales, but also the West Memphis plant, its thirty-three employees, and the use of equipment newly

---

[10] Based on data from prior years, Warren estimates that it will continue to purchase $3.1 million worth of gallon bottles from CCC per year. (Aff. Sam Charles Thomas ("Thomas Aff.") ¶ 18.)

14

purchased and customized specifically for performance of the BSA. While many of these damages are quantifiable, CCC's loss in potential business through its commitment to establish a facility in a location where it otherwise would not, and to invest in equipment with limited applicability to other business opportunities, is more difficult to determine. Based on that uncertainty of calculated damages, the Court finds that CCC will likely suffer irreparable harm without the issuance of an injunction. See Roland Mach. Co., 749 F.2d at 386 (noting that a damage remedy is inadequate where the "nature of the plaintiff's loss [makes] damages very difficult to calculate.").

### III. Harm to Warren that might result if the injunction were issued

Warren claims that the issuance of an injunction will cause it substantial harm because of the investment it has already made in developing its own bottle manufacturing system. Warren is bound by a lease requiring it to pay $93,000.00 per month for the rental of manufacturing equipment. (Thomas Aff. ¶ 21.) In addition, the Defendant notes that it has already invested approximately $6 million in infrastructure to support its ability to manufacture bottles in the future. (Thomas Aff. ¶ 21.) By manufacturing its own bottles, Warren estimates that it will save approximately 3 cents on every bottle.[11] (Thomas Aff. ¶ 21.) The Defendant contends that it was forced to develop its own manufacturing capacity after CCC "unequivocally and continuously refused to consent to an assignment of the BSA to Warren." (Def.'s Mot. at 20.)

The Court finds Defendant's argument to be without merit. As noted above, rather than an unequivocal denial, CCC's response to the request for consent was merely conditioned upon receiving assurances that information regarding Warren's intent to develop its own manufacturing

---

[11] Under the BSA, CCC manufactures approximately 7 to 8 million liter bottles and 800,000 gallon bottles per month. (Thrasher Aff. At 8.)

15

capacity, enter into an agreement with CCC's competitor Constar for its bottling needs, or otherwise fail to honor the agreement were inaccurate. Rather than being "forced" to develop its manufacturing needs, it appears that Warren undertook such measures in an effort to capitalize on an "opportunity for savings." (Tr. at 93.) Regardless of the impetus, the development of a manufacturing capacity that will save approximately 3 cents per bottle is more akin to a benefit to Warren than a harm. Any expense in developing the capacity is unrelated to the instant action. Further, any cost incurred due to the delay in utilizing its equipment appears to be easily quantifiable.

### IV.  Whether the public interest would be served by issuance of the injunction

Plaintiff maintains that the issuance of a preliminary injunction to maintain the status quo is in the public interest because it will prevent the immediate closure of the West Memphis facility and thus, the termination of its thirty-three employees. In response, Warren maintains that the public interest in respecting the rights of parties to enter into contracts as they see fit and to require parties to honor their contractual obligations weigh strongly in favor of denying Plaintiff's motion. Because CCC has a strong likelihood of success on its claim of anticipatory breach and the termination of the BSA will likely result in the closure of a plant and the firing of many employees, the Court finds that the public interest asserted by both parties will best be served through the issuance of an injunction.

Upon review of all four factors to be considered in ruling on a preliminary injunction, the Court finds that issuing a preliminary injunction is appropriate due to CCC's strong likelihood of success against termination and probability of suffering irreparable harm as well as the public interest favoring an injunction against unlawful termination of the agreement. In addition, Warren

does not appear likely to suffer any irreparable harm if it is enjoined from terminating the BSA.

Accordingly, the Court GRANTS Plaintiff's application for a preliminary injunction.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a preliminary injunction is GRANTED.

IT IS SO ORDERED this 3rd day of March, 2006.


                         s/ J. DANIEL BREEN
                         UNITED STATES DISTRICT JUDGE